ANNE M. ABBATE, Respondent, v GUY ABBATE, Appellant.

Second Department, July 27, 1981

APPEARANCES OF COUNSEL

*Cadwalader, Wickersham & Taft (Howard R. Hawkins, Jr., Earl H. Nemser* and *Richard C. Finke* of counsel), for appellant.

*Brookman & Brookman (Michael D. Brookman* and *Sanford J. Shaffer* of counsel), for respondent.

OPINION OF THE COURT

DAMIANI, J.

The issues on this appeal are whether the facts present a basis for the exercise of so-called long-arm jurisdiction over the person of the nonresident defendant and whether plaintiff's action for rescission of a contract upon the ground of fraudulent inducement is barred by the Statute of Limitations.

THE FACTS

The parties were married in 1956 and have four children. The defendant husband is a medical doctor. They moved to this country from Europe in 1960 and took up residence in Brooklyn, New York. The husband became an officer in the United States Air Force and his family moved with him to his assigned post in Illinois. While the parties were residents of that State, the wife obtained a decree of divorce from the Circuit Court for the Twentieth Judicial Circuit of Illinois, filed September 28, 1966, upon the ground of the husband's adultery. The wife was awarded custody of the children and the decree contained the following provision regarding their support and alimony for the wife: "C. That child support for the four (4) minor children of this marriage shall be paid by the defendant through the Clerk of this Court to the plaintiff for the use and benefit of said children in the sum of Five Hundred ($500.00) Dollars per month and at the same time and in the same manner alimony shall be paid to the plaintiff in the sum of Two Hundred ($200.00) Dollars per month, said first payment of Seven Hundred ($700.00) Dollars to be due and owing on or about the first day of October, 1966. Said Seven Hundred ($700.00) Dollars monthly obligation shall continue until the defendant's income from all sources after Federal Income Taxes equals Sixteen Thousand Eight Hundred ($16,800.00) Dollars per year whereupon, and immediately upon reaching said figure in any calendar year, child support and alimony shall be based on a percentage basis. After said Sixteen Thousand Eight Hundred ($16,800.00) Dollar income is reached,

Fifty Per Cent (50%) of defendant's income as above described shall go to the plaintiff and minor children as follows. Twenty Per Cent (20%) of defendant's income to the plaintiff as alimony and Thirty Per Cent (30%) of the defendant's income to the plaintiff for the use and benefit of the children as child support. The Court being aware of the defendant's consent to support the minor children until the age of twenty-one (21) or until emancipation after the age of Eighteen (18) years, it is hereby ordered and decreed that said child support shall extend to each child until that child reaches twenty-one (21) or becomes emancipated after the age of eighteen (18) years, whichever occurs first. For these purposes a child leaving its home to reside elsewhere for the purpose of schooling or other educational reasons shall not be interpreted as leaving the household of the plaintiff. When a child becomes emancipated or reaches twenty-one (21) whichever occurs first, after the age of eighteen (18), said thirty per cent (30%) figure above-described shall be reduced accordingly by one-quarter, there being four (4) minor children of this marriage."

In the summer of 1972 the parties executed an agreement which had the effect of modifying the provisions of the Illinois divorce decree by increasing the $700 monthly payments specified therein to $900 at first, and to $1,000 per month shortly thereafter. The agreement also contained, *inter alia,* a clause which provided for the adjustment of monthly payments at the end of each calendar year by an amount reflecting the increase in the United States Department of Commerce cost of living index. While the agreement thus increased payments to the wife, it did not contain a provision like the one in the divorce decree calling for the husband to pay her one half of his "after tax income".

In 1978 the wife learned that her former husband had become very successful and that his 1972 income was more than she had been led to believe when she signed the agreement. On or about October 10, 1978 this action was commenced by personal service of a summons upon the defendant at his home in North Carolina. The complaint was served on December 4, 1978, seeking, in substance, to set aside the agreement dated August 14, 1972 upon the ground that it was induced by fraud.

Thereafter the defendant moved pursuant to CPLR 3211 (subd [a], pars 5, 8) to dismiss the action upon the grounds that (1) plaintiff's cause of action for rescission of their 1972 agreement was barred by the Statute of Limitations and (2) the courts of New York lacked jurisdiction over his person. A hearing was held on the motion before Mr. Justice DOUGLAS F. YOUNG in Special Term, Nassau County. The proof adduced at the hearing established that after their divorce in Illinois the parties each eventually returned to New York. In May of 1971 the defendant moved with his new wife to Waynesville, North Carolina, where he established a medical practice.

In 1972 the defendant's after-tax income, for the first time, exceeded the $16,800 trigger figure specified in the divorce decree and his accountant wrote to the plaintiff informing her that based on defendant's 1971 tax return he had $17,255.80 in after-tax income. The plaintiff then became entitled to one half the defendant's after-tax income rather than the specified monthly payments of $700. The result was an increase of only $227.90 per year, from $8,400 to $8,627.90.

In the spring of 1972 the plaintiff made several telephone calls to defendant at his home in North Carolina seeking more money. Finally, she spoke to a New York lawyer who agreed, as an accommodation, to write to the defendant on her behalf despite the fact that she could not afford to employ him.

In mid-May, 1972, defendant, after receiving the letter from the New York lawyer, contacted an attorney named John I. McMahon, who was admitted to the Bar of the courts of Pennsylvania and had his offices in that State. McMahon testified at the hearing that he became acquainted with defendant in 1970 when he became general counsel to an investment advisory company then called Personal Money Management, Inc., which directed its efforts toward incorporating high income individuals such as doctors and establishing pension plans and "all the other things that go with a professional corporation." It had a branch in North Carolina and Dr. Abbate became its client. Apparently, McMahon handled the establishment of a professional corporation for

Dr. Abbate and the creation of pension and profit-sharing plans, etc. The incorporation papers were filed on September 15, 1971.

Defendant spoke to McMahon by telephone and revealed that he had previously been married and divorced and that the former Mrs. Abbate had asked him to change the terms of the alimony and support provisions of the divorce decree. Defendant asked McMahon for help.

Defendant testified that in the spring of 1972 he had held some seven telephone conversations with his former wife concerning her request for more money and that, as a result of those conversations, he reached an agreement with her to increase monthly payments. During these conversations he told plaintiff that if they stayed with the old agreement things would probably get a lot better because he had just started his North Carolina practice. After he negotiated all the terms of the agreement on the telephone with his wife, he called McMahon and asked him to put those terms in the form of a legal document that would supersede the original divorce degree. He did not give McMahon authority to negotiate with plaintiff.

The plaintiff's version of these telephone conversations was quite different from that of defendant. According to her, she called defendant in the spring of 1972 and told him that she was having financial troubles and needed more money. Defendant said that he could not help her and, although they spoke on the telephone about modifying the divorce decree, they always ended up arguing and they never agreed to anything.

Defendant testified that during these telephone conversations with plaintiff he never said that he was broke and could not afford to pay more. When plaintiff asked for more money, the only thing that he thought necessary was to reach agreement on "a fee that she could accept."

In any event, when defendant called McMahon he "laid out" the financial terms of the agreement and McMahon suggested the cost-of-living escalation clause. McMahon could not recall whether defendant told him that he had reached agreement on those terms, but he assumed that there had to have been some prior discussion and that de-

fendant had not "dreamed" them up "out of the air." Defendant told McMahon that he wanted him "to go to New York and to get this deal made with Mrs. Abbate" and McMahon said that he would do the best he could. He testified that his instructions from defendant were to "persuade [plaintiff] so sign the agreement."

Thereafter, McMahon called the New York attorney who had written to defendant and, after ascertaining that that attorney did not represent Mrs. Abbate, he called her directly. He told plaintiff that he wanted to talk with her about her request to modify the Illinois divorce decree and they arranged to meet in New York City on August 14, 1972. McMahon then telephoned defendant and reviewed the terms of the new agreement with him. As the result of that conversation, or several conversations, a document was prepared and was sent to defendant in North Carolina for approval of its terms and for signature. Defendant returned the signed original and an unsigned copy. McMahon was then prepared for his previously scheduled meeting with plaintiff in New York City.

McMahon was extensively examined by counsel concerning his power to negotiate on behalf of defendant. McMahon did not specifically ask for the power to negotiate. He believed that, when he went to New York, if plaintiff disagreed about some minor point he could make a change, but as to the amount to be paid per month, defendant was firm.

McMahon was also questioned concerning what he knew about defendant's income before he was to meet with Mrs. Abbate. He stated that Personal Money Management, Inc., the firm through which he had first dealt with defendant, had a rule that in order to become its client a doctor, or any other professional, had to have an annual income of at least $30,000. He did not then know the precise income of Dr. Abbate and he had assumed that defendant's income was around $30,000.

On August 14, 1972 McMahon took the train from Philadelphia to Pennsylvania Station in New York, arriving at about 1:00 P.M. He met Mrs. Abbate and they went to a restaurant "right off the lobby" of the station. After identifying himself, he said that he was going to explain the

terms of the agreement which he had prepared and which he wanted her to sign. McMahon gave the following description of his dealings with Mrs. Abbate:

"Q Did Mrs. Abbate do any negotiating with you?

"A Well, Mrs. Abbate was not pleased with the agreement, let's put it that way, if you want to call it negotiating. She wanted more money, and my situation was that *there was no more money to give her*, that this was, in a nicer way than I'm saying it, more or less meant on a take it or leave it basis, this is the best deal you're going to get from Dr. Abbate; and frankly I believed that at the time, because I know from my own experience in Pennsylvania she would not have gotten as much money based on what I thought his income was at that time" (emphasis added).

Plaintiff was very displeased with what McMahon was presenting for her signature, as she wanted more than the document provided. She was dissatisfied with the amount of the monthly payment. She wanted a provision requiring defendant to pay for graduate school for the children and a .provision requiring defendant to pay the medical and dental expenses for herself and the children. McMahon characterized his position as unyielding. He thought that the agreement was a "fair deal" for plaintiff because it amounted to almost 50% of what he believed defendant's income to be for that year, which was more than she probably could have obtained under Pennsylvania law. He did not tell plaintiff to "take it or leave it" because he "was trying to dance around that", but he "made it quite clear that * * * there was no more money", meaning that no more money was being offered. When Mrs. Abbate asked for more he said something like "the man has already given you approximately 50 per cent of his income, and that's the most you could get from any court, and here you don't even have to go into court and you're getting it."

Eventually McMahon persuaded Mrs. Abbate to accept the agreement as written. She signed it and he returned to Pennsylvania on the 5:30 or 6:00 P.M. train. Throughout this time they had been in the restaurant. He did not force her to sign and she was free to walk out of their meeting. During the time he was in New York he made no representa-

tion to Mrs. Abbate concerning defendant's assets or precise income.

After the agreement was signed, McMahon learned that Dr. Abbate's 1972 income was far more than he had thought at the time. He examined the reports which had been filed in connection with defendant's pension and profit-sharing plans and discovered that defendant's salary in 1972 was in excess of $85,000. Had he known defendant's true income at the time of his meeting with plaintiff, he would not have recommended that she sign the agreement. It was not a fair deal for plaintiff because under the divorce decree she was entitled to one half of defendant's after-tax income, whereas under the agreement he prepared she was to receive, at most, only $12,000 per annum and some "peripheral" benefits.

After the agreement was signed, McMahon had contact with plaintiff from time to time, usually around the beginning of each year when the payments due thereunder were to be adjusted for increases in the cost of living, and when the parties disagreed about the new amount or the check was late in coming. In July of 1978 plaintiff called and asked to come and see him. When they met he told plaintiff that defendant was making more money and "that it was time for her to go out and get herself an attorney and to take it from there."

The plaintiff, Mrs. Anne Abbate, testified in her own behalf that she met McMahon in a restaurant from approximately noon until late afternoon on August 14, 1972. They discussed a document which he had brought with him. She did not like all its terms, but McMahon essentially told her that it was either "sign it or leave it." He tried to convince her to sign. She was not represented by counsel. She did not at that time know what defendant's income was. Had she known that his income was, in fact, in excess of $30,000 she never would have signed. McMahon told her that defendant could not afford to pay her any more, that "this was a fair deal," and that a court would not give her more. She asked McMahon what defendant's income was, but he said that he did not know exactly. Although she wanted better terms, and during their discussion she tried to get them, McMahon

would not agree to any. She finally signed, "[b]ecause I was desperate." She was not forced to sign however.

In 1978 her daughter called defendant's office and spoke with defendant's secretary who told the daughter that her father was at his farm. This was the first time that plaintiff learned that defendant had a farm. As a result, she became suspicious that she had been cheated and she called Mr. McMahon and arranged a meeting. They met at the end of June, 1978. After her telephone call, McMahon examined his files and discovered that defendant's income had been in excess of $80,000 in 1972. McMahon told her to retain a lawyer. This was the first time she learned of his true income.

After her meeting with McMahon she called defendant and "I asked him why he never told me about the farm, and he said why should he. I wouldn't have signed the papers if I knew everything that he owns, when it came down to that."

Brazie Guy Abbate, the defendant, was called as a hostile witness by the plaintiff. He testified that his gross income in 1971, the year he moved from New York to North Carolina, was about $30,000 and his net after-tax income was $17,400. In September, 1971 he applied to form a professional corporation. He is, and was, the sole stockholder and sole doctor employed by the corporation. During its first fiscal year, from September 30, 1971 to August 31, 1972, the corporation had gross receipts of $174,000 and it paid him a salary of $98,420.

Defendant asserted that plaintiff knew what he was earning at the time the agreement was signed, explaining that his accountant had mailed her a letter "which at least gave her an idea of what our income was in 1971". He admitted that he did not tell her what his 1972 income was, but claimed that she had never inquired. By September, 1972 his corporation was earning $15,000 per month as the result of professional services he rendered. The only other employee of the corporation at that time was defendant's new wife, who had a salary of about $13,500. He never told plaintiff about the income of his corporation.

On cross-examination by his own counsel, defendant testified that he moved from New York to North Carolina in

May, 1971 and had resided there continually since that time. He had no office, bank accounts, telephone listing, employees or agents in New York. He did not practice medicine in New York and did not conduct or solicit business in this State. He derived no revenue from interstate commerce.

Dr. Abbate asserted that he had complied with the terms of the Illinois divorce decree and had made timely payments "[w]hen money was available." Mrs. Abbate had always made requests for more support. She initiated the discussions which led to the 1972 agreement now in question. Defendant was asked whether, during the discussions with plaintiff in the summer of 1972, he knew "for a certainty" what his corporation was earning, and defendant answered "I think I did."

■ ■ On September 25, 1979 Mr. Justice YOUNG rendered a memorandum decision holding (1) that defendant was subject to in personam jurisdiction under CPLR 302 (subd [a], par 1) because he committed a tortious act in New York and (2) that because the case involved actual fraud, the Statute of Limitations ran from the date of discovery and plaintiff's action was therefore not time barred. We affirm.

### THE CAUSE OF ACTION

In order to decide both the jurisdictional and Statute of Limitations questions raised on this appeal, it is first necessary to determine the gravamen of plaintiff's cause of action for rescission of the agreement. Plaintiff contends that she seeks to set aside that agreement on the ground of defendant's *actual* fraud. Defendant contends that plaintiff's claim is based solely upon *constructive* fraud. The difference between the two was recently explained in the case of *Brown v Lockwood* (76 AD2d 721, 730-731) as follows: "The law recognizes two kinds of fraud—actual or constructive. In order to sustain an action for actual fraud the plaintiff must prove: (1) that the defendant made a representation, (2) as to a material fact, (3) which was false, (4) and known to be false by the defendant, (5) that the representation was made for the purpose of inducing the other party to rely upon it, (6) that the other

party rightfully did so rely, (7) in ignorance of its falsity (8) to his injury (24 NY Jur, Fraud and Deceit, § 14; 37 CJS, Fraud, § 3). Constructive fraud may be defined as a breach of a duty which, irrespective of moral guilt and intent, the law declares fraudulent because of its tendency to deceive, to violate a confidence or to injure public or private interests which the law deems worthy of special protection *(Southern Inds. v Jeremias,* 66 AD2d 178, 182). The elements of a cause of action to recover for constructive fraud are the same as those to recover for actual fraud with the crucial exception that the element of *scienter* upon the part of the defendant, his knowledge of the falsity of his represenation, is dropped *(Manheim Dairy Co. v Little Falls Nat. Bank,* 54 NYS2d 345, 349; *Pitcher v Sutton,* 238 App Div 291, 293, affd 264 NY 638) and is replaced by a requirement that the plaintiff prove the existence of a fiduciary or confidential relationship warranting the trusting party to repose his confidence in the defendant and therefore to relax the care and vigilance he would ordinarily exercise in the circumstances *(Collins v Nelson,* 193 Wash 334; see 37 CJS, Fraud, § 35). The law regards the making of a misrepresentation by a defendant who possesses a position of superiority and influence over the plaintiff by reason of the confidential relationship between them as a breach of duty actionable as constructive fraud (see *Greenfield v Greenfield,* 123 NYS2d 19; 37 Am Jur 2d, Fraud and Deceit, § 15)."

In the case at bar plaintiff could not recover upon a theory of constructive fraud because no confidential relationship existed between her and her former husband or McMahon, who was defendant's, and not her, attorney. Plaintiff must therefore establish the existence of a cause of action for actual fraud or she cannot recover on the merits, irrespective of the jurisdiction and Statute of Limitations problems. The key to this case is to be found in section 256 of the Restatement of Agency, Second, which neither of the parties have cited and which states:

"Knowledge of Principal When Agent Innocently Makes a Misrepresentation

"If a principal knows facts unknown to a servant or other agent and which are relevant to a transaction which the

agent is authorized to conduct, and, because of his justifiable ignorance, the agent makes a material misstatement of facts, *the principal:*

"(a) *is subject to liability for an intentional misrepresentation, if he believed the agent would make the statement,* or for a negligent misrepresentation, if he had reason to know the agent would make the statement.

"(b) is not subject to liability in tort if he had no reason to know that the agent would enter into such a transaction, or if, after acquiring the information, he had no way of communicating with the agent" (emphasis added).

Comment *b* to this section states, in relevant part: "If a principal, knowing that an agent is about to conduct a transaction with inadequate or misleading information, intentionally withholds information from him for the purpose of enabling the agent honestly to misstate facts, the principal is subject to liability as for his own fraudulent statement if the agent subsequently does misstate such facts."

The illustrations provided by the Restatement (§ 256) state, in relevant part:

"Illustration:

"1. Desiring to sell advantageously a machine which he knows to be dangerously defective, P places it in his sales room, believing that his salesman will represent it to be sound. The salesman does as expected and T, the buyer, relies upon the statement of the salesman. Because of the defect the buyer is hurt. P is liable in an action for deceit and also for wanton conduct causing physical harm. * * *

"Illustration:

"2. P directs A to lease Blackacre as a home. P knows that A does not know that adjoining Blackacre is a bawdy house and does not tell him. *If he refrains from telling A in order that A may make a statement that the neighborhood is good, P is subject to liability in deceit to one renting the house upon A's assurance that the neighborhood is respectable*" (emphasis added).

The facts adduced at the hearing would permit a

fact finder at trial to conclude that defendant was guilty of actual fraud on the theory set forth in section 256 of the Restatement of Agency, Second. The amount of defendant's income was the factor upon which his duty to pay increased alimony and support under the Illinois divorce decree turned. Defendant moved to North Carolina in 1971 and his income improved slightly so that, for the first time, his net taxable income exceeded the $16,000 trigger contained in the divorce decree, requiring him to pay one half of his net taxable income to the plaintiff. Starting with the establishment of a professional corporation in September, 1971, defendant's practice became immensely more profitable, to the point that, by the spring of 1972, he was earning just short of $15,000 per month and he had reason to know that the corporation's gross receipts for its taxable year would be approximately $170,000 and his annual salary would exceed $80,000. When the plaintiff called and requested more money, defendant did not inform her of his vastly increased income and they argued on the telephone. Thereafter defendant received a letter from a New York lawyer and he realized that plaintiff might take legal action. Defendant then called McMahon. He did not disclose his income to McMahon, but the latter apparently got the idea that defendant could only afford to pay a little but not a great deal more than he was then paying. Defendant dictated to McMahon most of the essential terms of the agreement. Although providing for more than he had previously been paying, the new terms relieved him of his duty to pay one half of his net taxable income to plaintiff in the future. He had discussed those terms with his former wife on the telephone but apparently had been unable to gain her assent. He directed McMahon to prepare a document embodying those terms. McMahon drew the agreement and sent it to defendant for signature, after which defendant returned it to McMahon. Defendant directed McMahon to go to New York and persuade plaintiff to sign.

On August 14, 1972 McMahon traveled to New York and met with plaintiff. She was without counsel. She objected to the terms offered, but McMahon made several representations in order to induce her to sign. He told plaintiff that "there was no more money" and, although he

testified that he meant that no more money was being offered and not that the defendant did not have more money, what he meant was not what he said. Further, it appears that McMahon represented to plaintiff that through the agreement defendant would be giving her "approximately 50 per cent of his income." Although McMahon apparently made those representations innocently, they were false, and plaintiff was induced thereby to sign the agreement. Since defendant's income was the crucial factor in determining the amount he would have to pay under the Illinois decree, defendant had to believe that it would be necessary for McMahon to make some representation concerning· it in order to gain plaintiff's assent to an agreement modifying his support and alimony obligations under that decree. Thus, under the rule enunciated in section 256 of the Restatement of Agency, Second, defendant may be held liable for McMahon's misrepresentations as though made intentionally by defendant himself, regardless of whether McMahon made them innocently.

Defendant claims that his failure to disclose his income to plaintiff is not evidence of an intent to defraud, citing the following statement from *Amend v Hurley* (293 NY 587, 596) : " 'The law requires disclosure to be made only when there is a duty to make it, and this duty is not raised by the mere circumstance that the undisclosed fact is material, and is known to the one party, and not to the other, or by the additional circumstances that the party to whom it is known, knows that the other party is acting in ignorance of it' *(Peoples' Bank of City of New York* v. *Bogart,* 81 N. Y. 101, 107). It is not fraud for one party to say nothing on the subject where no confidential or fiduciary relation exists and *where no false statement or acts to mislead the other are made (Peoples' Bank of the City of New York* v. *Bogart, supra; Dambmann* v. *Schulting* [75 NY 55], *supra)"* (emphasis added).

In our opinion this quotation from *Amend v Hurley (supra)* is inapplicable for two reasons. First, McMahon did make a misrepresentation to plaintiff as to defendant's income. Second, defendant was under a duty to make disclosure. In *Nasaba Corp. v Harfred Realty Corp.* (287 NY 290, 295) the Court of Appeals held that where a com-

plaint alleges, or it can be inferred from the complaint, that the defendant "misrepresent[ed] or conceal[ed] a material fact" in order to produce a false impression and mislead the plaintiff, it alleges a "deceit which is the material constitutent of actual fraud * * * Concealment with intent to defraud of facts which one is duty-bound *in honesty* to disclose is of the same legal effect and significance as affirmative misrepresentations of fact". (Emphasis added.) It is our view that defendant was "duty bound in honesty" to disclose his true income because it was the factor determining the amount he had to pay under the divorce decree. Without such a duty to disclose, the decree would have been unenforceable. Defendant was also bound to disclose the amount of his income because it constituted a fact basic to the transaction (see Restatement, Torts 2d, § 551, comment *e*). Defendant himself appears to have recognized a duty to disclose his income because he had his accountant send plaintiff notice of his 1971 income soon after his taxes for that year were calculated. It seems he then acted promptly to secure a modification agreement before his taxes for 1972 were calculated and she would then learn of his increased earnings.

Defendant argues that McMahon was an independent contractor and not his agent and, therefore, he is not responsible for the latter's representations to plaintiff. The law is clear that the distinction between the two is that an independent contractor is a person who contracts with another to do something for him, but who is not controlled or subject to the control of the other in the performance of the work and is responsible only for attaining the desired result. An agent, on the other hand, is a person authorized by another to act on his account and is subject to the control of the principal as to the details of the work (2 NY Jur 2d, Agency, § 8). Control is the key element. Here, defendant himself testified that McMahon was under his orders concerning the terms of the agreement and was directed to go to New York to gain plaintiff's assent. The fact that under defendant's view McMahon lacked authority to negotiate different terms does not make McMahon an independent contractor (a person with unfettered control over the work) but rather makes him a servant, which is

a species of agent without authority to bind the master in his business dealings (see Restatement, Agency 2d, §§ 1, 2, comment *a*; 2 NY Jur 2d, Agency, § 3). Accordingly, it is clear that McMahon was defendant's agent and not an independent contractor. As the master, defendant may be liable for the misrepresentation of his servant McMahon under the theory enunciated in section 256 of the Restatement of Agency, Second.

### IN PERSONAM JURISDICTION

CPLR 302 states, in relevant part:

"Personal jurisdiction by acts of non-domicilaries

"(a) Acts which are the basis of jurisdiction. As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

"1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

"2. commits a tortious act within the state, except as to a cause of action for defamation of character arising from the act".

█ Paragraph 1 of subdivision (a) states that a court can exercise long-arm jurisdiction where the plaintiff's cause of action arises out of the transaction of business by the defendant within the State. The question for determination then is whether defendant's act in sending McMahon into New York to persuade plaintiff to sign the modification agreement constituted a transaction of business. We think it did.

There are a great number of cases on the question of what constitutes a transaction of business within the meaning of CPLR 302. Basically, the cases hold that in order to constitute a transaction of business in New York the defendant must have committed some act by which he purposefully availed himself of the privilege of conducting activities in this State, thus invoking the benefits and protection of our laws (*Hanson v Denckla*, 357 US 235, 253).

One "purposeful" act in this State is enough to serve as the basis for the exercise of long-arm jurisdiction over the non-domiciliary defendant *(Reiner & Co. v Schwartz*, 41 NY2d 648, 651-652). However, where that one act is purely ministerial, as where the parties reach full agreement on a contract in their respective home States and merely execute the formal document memorializing their agreement in New York, it is doubtful that jurisdiction would be sustained (cf. *Longines-Wittnauer Watch Co. v Barnes & Reinecke*, 15 NY2d 443, 457; *Hi Fashion Wigs v Hammond Adv.*, 32 NY2d 583, 586; McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR, C302:11, p 78). The negotiation and execution in New York of a separation agreement between a resident wife and a nondomiciliary husband constitutes a transaction of business by the latter within the meaning of CPLR 302 *(Kochenthal v Kochenthal*, 28 AD2d 117). Physical presence of the defendant or his agent in this State "is one of the most concrete manifestations of his purposeful activity in New York" (McLaughlin, Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, CPLR, C302:10, p 74). Where the claimed jurisdictional basis consists of the acts of an agent, the plaintiff must show that the defendant principal requested the agent to perform purposeful acts in New York for the principal's benefit *(Leasco Data Processing Equip. Corp. v Maxwell*, 319 F Supp 1256, mod on other grounds 468 F2d 1326).

In our view the facts of this case make out the transaction of business in this State. Although the contract in question was not a separation agreement as in *Kochenthal v Kochenthal* (28 AD2d 117, *supra)* it was its equivalent, modifying as it did the support and alimony provisions of a divorce decree. As stated above the proof amply indicates that McMahon was defendant's agent. In an apparent effort to show that this case involves only the execution of an agreement reached on the telephone and thus does not involve the transaction of business, defendant had expended a great deal of energy to demonstrate that McMahon lacked the authority to "negotiate" on his behalf because he had dictated inflexible terms to McMahon for inclusion in the agreement. The word "negotiate" does not merely mean

haggling over and changing contract terms. To negotiate also means to "procure agreement" by means of discussion *(Taylor v Morrison,* 310 Ill App 671; *First Nat. Bank of Greenville v Sherburne,* 14 Ill App 566, 568). Defendant testified and argues on appeal that the parties had reached agreement on the telephone as to the terms of the contract and that all that happened in New York was the formal execution of the contract by the wife. This testimony and argument is clearly belied by the overwhelming testimony of both plaintiff and McMahon that she was very dissatisfied with the terms and that McMahon spent more than four hours convincing her to sign. If agreement had been reached beforehand, McMahon could have mailed the document to plaintiff for her signature just as he mailed it to the defendant for his signature. Defendant purposefully directed McMahon to travel from Pennsylvania to New York and persuade plaintiff to accept his terms. This is the clearest sort of a case of transaction of business.

It is also contended that defendant is subject to long-arm jurisdiction under the "commits a tortious act within the state" language of CPLR 302 (subd [a], par 2). Determination of this claim requires that we decide the *locus delicti,* the place of the wrongful act, where intentional fraud is perpetrated by a principal through innocent misrepresentations by an agent under the theory set forth in section 256 of the Restatement of Agency, Second. Assuming that McMahon's misrepresentation in New York, that "there was no more money", was innocently made by him, defendant can be charged with intentional fraud for failing to correct his agent's misapprehension of the true facts when he must have believed that McMahon would inevitably have to make that or a like misrepresentation in order to get plaintiff to sign. Although any fraudulent intent on defendant's part had to have been conceived in his home State of North Carolina, it is our view that the *locus delicti* is the place of misrepresentation and not the place where the fraudulent intent was formulated. Accordingly, we hold defendant is also subject to the in personam jurisdiction of our courts for committing a tortious act in this State through the misrepresentations of his agent McMahon.

## STATUTE OF LIMITATIONS

In the case of *Quadrozzi Concrete Corp. v Mastroianni* (56 AD2d 353, app dsmd 42 NY2d 824) this court, in an opinion by Justice, now Presiding Justice, MOLLEN, clearly held that an action to obtain equitable relief upon the ground of actual fraud is governed by the Statute of Limitations contained in CPLR 213 (subd 8) and that, accordingly, the time within which the action must be commenced is to be computed from the time the plaintiff discovered the fraud or could with reasonable diligence have discovered it. Since the plaintiff in this case seeks the equitable remedy of rescission of a contract based upon actual fraud, our holding in *Quadrozzi* is controlling. The proof establishes that plaintiff discovered the fraud in 1978 and that she commenced this action in the same year. The record contains no evidence to suggest that plaintiff could, with reasonable diligence, have discovered it at an earlier date. Accordingly, her action was timely brought (see CPLR 203, subd [f]) and Special Term properly denied defendant's motion to dismiss upon that ground.

Defendant argues, however, that the *Quadrozzi* case should not be followed here and that we should hold the plaintiff's action time barred upon the basis of *Curry v Chollette* (57 AD2d 604), decided by this court approximately one month after *Quadrozzi (supra)*. Although in his Practice Commentaries Professor McLaughlin has opined that the decision in *Curry* was contrary to the rule announced in *Quadrozzi* (see McLaughlin, Supplementary Practice Commentaries, McKinney's Cons Laws of NY, Book 7B, 1980-1981 Pocket Part, CPLR, C213:9, pp 82-83), it is our view that those cases are not in conflict. An examination of the record in *Curry v Chollette* (57 AD2d 604, *supra)* reveals that the plaintiff husband therein sought to set aside a separation agreement upon the ground that it was induced by fraud. The complaint alleged that at the time plaintiff signed the agreement he was in a rundown condition, was highly nervous and was suffering from alcoholism, that his judgment was consequently impaired and that defendant failed to properly explain the intent and import of the agreement to him. Our court concluded

that the gravamen of that complaint was not actual fraud on the part of the defendant wife, but rather was that she took unfair advantage of her position of strength and his weakened condition to negotiate an agreement favorable to herself. We therefore held that only constructive fraud was involved in *Curry,* and for that reason the Statute of Limitations ran from the time of the commission, rather than the discovery, of the fraud *(Buttles v Smith,* 281 NY 226). *Quadrozzi* and the instant case are distinguishable from *Curry,* since the gravamen of the complaints was actual, not constructive, fraud.

Defendant next argues, in effect, that the *Quadrozzi* holding has been overruled by the decisions of the Court of Appeals in *Matter of Paver & Wildfoerster (Catholic High School Assn.)* (38 NY2d 669, 672) and *Sears, Roebuck & Co. v Enco Assoc.* (43 NY2d 389, 395), where it was held that the " 'general principle [is] that time limitations depend upon, and are confined to, the form of the remedy' ". Since in this case plaintiff seeks the equitable remedy of rescission, defendant argues that she should not be accorded the benefit of the discovery rule even though her case is based upon a claim of actual fraud. In *Paver (supra,* p 676), however, the court stated that the rule that the period of limitations is dependent upon the form of the remedy, is subject to "exceptions". This case represents one of those exceptions. The general rule is that a cause of action accrues, and the Statute of Limitations begins to run, on commission of the wrong. In cases of actual fraud, however, the Legislature adopted the rule that the statute ran from discovery rather than commission because, in the absence of such a rule, a defendant who has been guilty of actual fraud might prevent the plaintiff from recovering by continuing the deception until the statute had run (see McLaughlin, The Discovery Provisions of Article Two of the CPLR and Other Problems With the Statute of Limitations, Tenth Ann Report of NY Judicial Conference, 1965, pp 97-98). The reason for the discovery rule is thus to be found in the nature of the wrong and not in the remedy by which the plaintiff has chosen to seek redress for that wrong. It therefore applies in cases of actual fraud whether the requested relief be legal or equitable in nature.

Accordingnly, the order appealed from should be affirmed, with costs.

HOPKINS, J. P., LAZER and MANGANO, JJ., concur.

Order of the Supreme Court, Nassau County, dated September 25, 1979, affirmed, with costs.