J. Morris ANDERSON, Plaintiff,

v.

INDIANA BLACK EXPO, INC.; and Charles Williams, Individually, Defendants.

No. 99 Civ. 3903(RWS).

United States District Court, S.D. New York.

Jan. 20, 2000.

J. Morris Anderson, Philadelphia, PA, Plaintiff, pro se.

Morris, Duffy, Alonso & Faley, New York, NY, for Defendant Indiana Black Expo; Andrea M. Alonso, of counsel.

## OPINION

SWEET, Senior District Judge.

Defendants Indiana Black Expo (the "Expo") and Charles Williams ("Williams") have each moved, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment dismissing the complaint of plaintiff *pro se* J. Morris Anderson ("Anderson") for lack of personal jurisdiction over the named defendants. Alternatively, Expo has challenged venue in this jurisdiction, and requests either dismissal or transfer to the Southern District of Indiana as a result. For the reasons set forth below, these motions shall be granted to the extent that they request dismissal due to the absence of *in personam* jurisdiction over either Williams or the Expo.

### The Parties

Anderson is a Pennsylvania resident and the owner of the Miss Black America Beauty Pageant (the "Pageant"), the principal place of business of which is located in Philadelphia, Pennsylvania.

The Expo is an Indiana not-for-profit corporation, with its principal place of business located in Indianapolis, Indiana.

Williams is an Indiana resident, and at all times relevant to the instant action was President of the Expo.

### Facts and Prior Proceedings

The facts set forth below are taken from the parties' Rule 56.1 statements, affidavits, and exhibits, and are not in dispute except where otherwise indicated.

Anderson is the founder and Executive Producer of the Pageant, and has produced the Pageant for a not-insignificant number of years. In 1991, Anderson filed suit against boxer Mike Tyson ("Tyson"), Williams, and the Expo in the wake of well-publicized accusations against Tyson for the sexual assault of various Pageant participants. The Pageant that year had been held in Indianapolis, Indiana. In that action (the "First Pennsylvania Action"), which was filed in the Eastern District of Pennsylvania, Anderson alleged various injuries arising out of the negative publicity associated with Tyson's behavior.

According to Anderson, repeated efforts were made to convince him to settle the First Pennsylvania Action. Discussions to that end took place in Pennsylvania, New Jersey, New York, and Washington, D.C., with Don King ("King") taking an especially active role in pushing settlement. In an October 19, 1991 meeting in Washington, D.C., the terms of a settlement agreement were finally agreed upon. Though Williams was not present in Washington for that initial meeting, during a meeting with lawyers the following day Williams participated telephonically, confirming his acceptance of the details of the agreement. In his papers, Anderson has pressed that both King and Don King Enterprises ("DKE"), as well as non-party Thadeus E. Watley ("Watley"), functioned as both the Expo's and Williams' agent throughout settlement negotiations.

However, neither Expo nor Williams signed any formal agreement in Washington, D.C. Instead, approximately a week thereafter Anderson traveled with Watley to New York City to meet with Williams and King at King's residence. There, after some initial hesitation concerning the wisdom of signing any agreement without first consulting the Expo's own counsel, Williams committed the Expo to the agreement to which it had already devoted itself in principle.

The terms of the written agreement (the "agreement") between Anderson and the Expo, dated October 30, 1991, are as follows:

> Indiana Black Expo, Inc. ("IBE"), and J. Morris Anderson Production Company, the producer of the Miss Black America ("MBA") pageant, for good and valuable consideration, the receipt and adequacy of which is hereby acknowledged, agree:
>
> (1) The MBA pageant shall hereafter be an event of the IBE; and
>
> (2) IBE shall provide the site, set and lights for the production of the MBA pageant.
>
> This agreement shall apply for the 1992 IBE and MBA pageant. If J. Morris Anderson Production Company delivers a television audience of a minimum of 40% ADI, then J. Morris Anderson Production Company shall have an option to extend this agreement for the following year. Upon the same condition, J. Morris Anderson Production Company shall have the same option through the year 1997.

The agreement, which was signed by Anderson and by Williams on the Expo's behalf, contained an addendum that "[t]he IBE has the option to sell two (2) commercial spots MBA pageant national TV special & retain the profit."

Though the record reveals no memorialized contract between King and Anderson to complement the terms of the agreement between Anderson and the Expo, according to Anderson King allegedly made Anderson a variety of connected promises concerning his future promotion of the

Pageant—including, *inter alia,* a promise to provide financial and promotional assistance to the Pageant, and to tie the Pageant in with other "pay-per-view" events promoted by King. The First Pennsylvania Action was ultimately dismissed with prejudice, though it is unclear from the parties' submissions whether this was due to a formal settlement among the parties.

While the Expo hosted the Pageant as promised in 1992, in 1993 it refused to host the Pageant, explaining that the Pageant had failed to comply with the agreement's television market share provision. The Expo notified Anderson of this refusal in June of 1993, shortly before taping was scheduled to begin in Indianapolis. As a result of this refusal to host the 1993 Pageant, Anderson was required to radically alter the production of the Pageant.

In 1994, Anderson filed suit once again in the United States District Court for the Eastern District of Pennsylvania, this time seeking recovery from Tyson, King, DKE, and Williams for breach of contract, misrepresentation, and assault. Discovery commenced in that action, as did motion practice.

In an opinion issued June 1, 1994, the Honorable Clarence C. Newcomer found that personal jurisdiction could not be exercised over either Williams or the Expo, explaining that "plaintiff is unable to prove that the defendants' ties to the state are sufficiently direct," and that their "indirect contacts with the state were not that which would make them anticipate being subject to a suit in Pennsylvania." *Anderson v. Tyson,* No. CIV. A. 94–0528, 1994 WL 237365, at *2 (E.D.Pa. Jun. 1, 1994).

In an another opinion, issued November 4, 1994, Judge Newcomer dismissed Anderson's claims against King and DKE, ruling in part that any oral contract between King or DKE and Anderson would be barred by New York's Statute of Frauds, and that Anderson could not recover for misrepresentation merely by characterizing an otherwise infirm breach of contract claim as a claim for fraud. *See*

*Anderson v. Tyson,* Civ. A. No. 94–0528, 1994 WL 630207, at *3 (E.D.N.Y. Nov. 4, 1994). Judge Newcomer also held that Anderson's claim for assault would be dismissed for lack of standing, and because Anderson had failed to allege either King's or DKE's participation in the assault. *See id.* at *4. It was further observed that Tyson, who had never been served, was not a proper party to the action. *See id.* at *1. Judge Newcomer's rulings were subsequently affirmed by the Court of Appeals for the Third Circuit.

Anderson's complaint in this action, which essentially seeks recovery against the Expo and Williams for the Expo's failure to satisfy its obligations to the Pageant under the terms of their 1991 agreement, was filed on May 28, 1999. The complaint alleges fifteen causes of action, the first and fourteenth sounding in contract and dependant upon the exercise of diversity jurisdiction, and the remaining causes of action alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.*

The Expo and Williams filed their respective motions on September 1, 1999, and after receiving briefing from both parties the matter was marked fully submitted on September 29, 1999.

### Discussion

■ If challenged, a plaintiff ultimately bears the burden of establishing jurisdiction over a defendant by a preponderance of the evidence, *see Ball v. Metallurgie Hoboken–Overpelt, S.A.,* 902 F.2d 194, 197 (2d Cir.1990); *Levisohn, Lerner, Berger & Langsam v. Medical Taping Sys., Inc.,* 10 F.Supp.2d 334, 338–39 (S.D.N.Y.1998). To overcome a jurisdiction-testing motion where a court does not hold a formal evidentiary hearing, however, a plaintiff need only make a *prima facie* showing of jurisdiction. *See Ball,* 902 F.2d at 197. Where a defendant challenges jurisdiction after discovery by way of motion pursuant to Rule 56, Fed.R.Civ. P., "the court proceeds, as with any sum-

mary judgment motion, to determine if undisputed facts exist that warrant the relief sought." *Id.; see Gulf Union Ins. Co. Saudi Arabia v. Bella Shipping Co.,* No. 91 CIV. 2814(PKL), 1994 WL 455117, at *2 (S.D.N.Y. Aug. 22, 1994). While bare legal allegations may be sufficient to survive a pre-discovery dismissal motion for lack of personal jurisdiction, "without factual support, [such allegations] ... fail to make a *prima facie* showing at the summary judgment stage." *Ball,* 902 F.2d at 199. While discovery has not closed in the instant action, it is apparent from the parties' submissions that ample discovery was obtained during the pendency of Anderson's previous action before Judge Newcomer to justify application of this more demanding standard.

█ Personal jurisdiction over a nonresident defendant is typically to be determined by the law of the jurisdiction in which a federal court sits. *See Bensusan Restaurant Corp. v. King,* 126 F.3d 25, 27 (2d Cir.1997). Accordingly, an assessment of whether New York's Civil Practice Law and Rules ("CPLR") provides for jurisdiction over the Expo and Williams must be made. *See* CPLR §§ 301, 302 (McKinney 1990). A two-fold inquiry is required. First, a determination must be made as to whether New York law provides a basis for exercising personal jurisdiction over the defendant. If jurisdiction is proper as a result of this analysis, a court must then determine whether the exercise of such jurisdiction would offend federal standards of due process. *See Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 784 (2d Cir.1999).

Insofar as jurisdiction is concerned, both the Expo and Williams have challenged whether they are amenable to suit in New York. Both claim to have no significant presence in the state, and to have had negligible contact with the state in connection with their dealings with Anderson.

In opposition, Anderson contends, among other things, that: (1) because his fourteen RICO-related claims involve a "federal question," this Court is the proper forum for adjudication of those claims; (2) that the Expo and Williams maintained a presence in New York through their agents King and DKE, and that King provided instructions to Watley from his offices in New York City; (3) that defendants' business dealings with Anderson were paid for by their New York Agents, King and DKE, and that such payments were made out of New York; (4) that the contract presently being sued upon was signed in New York by defendant Williams; (5) that "the contract was performed in the State of New York" because Anderson caused the Pageant to be aired on both New York City and Syracuse, New York television stations, and because a thirty-second commercial advertising the Expo was carried during those broadcasts; (6) that a good deal of the pre-production work for the 1992 and 1993 Pageants was performed in New York; (7) that personal jurisdiction exists over the defendants because both the Expo and Williams, through King, committed a "tort[i]ous act of intimidation" in New York; and (8) that jurisdiction may properly be exercised over the Expo and Williams because the Pageant had been previously aired in New York, and because the Expo's breach rendered Anderson unable to have the Pageant aired in New York.

Because, as set forth below, it is determined that personal jurisdiction does not exist over the defendants in this action, the Expo's contentions concerning venue shall not be addressed.

### I. *New York Law Does Not Provide A Basis For Exercising In Personam Jurisdiction Over Either The Expo Or Williams*

#### A. *"Doing Business" Under CPLR § 301*

█ CPLR § 301 states that a New York court "may exercise jurisdiction over persons, property, or status as might have been exercised heretofore." The statute

incorporates all bases for jurisdiction previously recognized at common law. *See Penny v. United Fruit Co.,* 869 F.Supp. 122, 125 (E.D.N.Y.1994). Activities rise to the level of "doing business" only when the defendant is engaged in " 'such a continuous and systematic course' of activity that it can be deemed to be 'present' in the state of New York." *Klinghoffer v. S.N.C. Achille Lauro,* 937 F.2d 44, 50–51 (2d Cir. 1991) (*quoting Laufer v. Ostrow,* 55 N.Y.2d 305, 310–311, 449 N.Y.S.2d 456, 458, 434 N.E.2d 692, 694 (1982)); *see Mareno v. Rowe,* 910 F.2d 1043, 1046 (2d Cir.1990).

■■■ Without any physical presence in New York, a foreign defendant may be subject to suit in New York if it conducts, or purposefully directs, business " 'not occasionally or casually, but with a fair measure of permanence and continuity.' " *Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.,* 77 N.Y.2d 28, 33–34, 563 N.Y.S.2d 739, 741, 565 N.E.2d 488, 490 (1990) (*quoting Tauza v. Susquehanna Coal Co.,* 220 N.Y. 259, 267, 115 N.E. 915, 917 (1917)). The test, a "simple pragmatic one," *Bryant v. Finnish Nat'l Airline,* 15 N.Y.2d 426, 432, 260 N.Y.S.2d 625, 629, 208 N.E.2d 439, 441 (1965), is necessarily fact-sensitive. *See Landoil Resources Corp. v. Alexander & Alexander Servs., Inc.,* 918 F.2d 1039, 1043 (2d Cir.1990). However, a defendant's "[s]olicitation of business alone" cannot justify a finding of presence in New York pursuant to section 301, *Laufer,* 55 N.Y.2d at 310, 449 N.Y.S.2d at 459, 434 N.E.2d at 694, unless the solicitation "is substantial and continuous, and [the] defendant engages in other activities of substance in the state." *Landoil,* 918 F.2d at 1043–44; *see Beacon Enters., Inc. v. Menzies,* 715 F.2d 757, 763 (2d Cir. 1983).

■■■ According to undisputed portions of the record, neither the Expo nor Williams maintain a presence in New York such that this Court could properly exercise jurisdiction over them under Section 301. The Expo is an Indiana corporation, and is neither registered within New York

as a foreign corporation nor authorized to do business within this state. Moreover, in uncontested submissions, the Expo has stated, *inter alia,* that: (1) it has neither supplied any goods or services to any New York resident or corporation, nor purchased any goods from any New York vendor or supplier; (2) it does not derive identifiable income or revenue from any entity in New York; (3) it has never maintained a bank account in New York; (4) it does not own, lease, possess or otherwise hold any interest in any real estate situated in New York; (5) it does not solicit any business in New York; (6) it does not advertise its business in New York; (7) it has never had a telephone listing in New York; and (8) it does not have any employees in New York. Williams, who is an Indiana resident, has similarly represented that he has not maintained any significant presence in New York.

Anderson has not submitted any evidence from which it could be inferred that these representations are incorrect, or from which it could be concluded at trial that either Williams or the Expo are subject to jurisdiction in New York under Section 301. Accordingly, section 301 does not provide a basis under which jurisdiction may be exercised over the defendants in this action.

### B. *Chick Is Not Subject To New York's Long–Arm Jurisdiction*

#### 1. *Section 302(a)(1)*

New York's long-arm statute provides in pertinent part:

(a) . . . As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent:

 1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

 2. commits a tortious act within the state . . . ; or

3. commits a tortious act without the state causing injury to person or property within the state, ... if he ...

> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce....

CPLR § 302(a). While its language is expansive, "[s]ection 302(a) does not extend New York's long-arm jurisdiction to the full extent permitted by the Constitution." *Levisohn, Lerner, Berger & Langsam*, 10 F.Supp.2d at 339.

█ Under CPLR § 302(a)(1), personal jurisdiction exists over a nondomiciliary who transacts business in New York so long as the cause of action itself "arises" out of the subject matter of the business transacted. *See* CPLR § 302(a)(1); *Agency Rent A Car Sys., Inc. v. Grand Rent A Car Corp.*, 98 F.3d 25, 29 (2d Cir.1996). This test must be met for each cause of action asserted, *see Nassar v. Florida Fleet Sales*, 69 F.Supp.2d 443, 446 (S.D.N.Y.1999), and is therefore highly fact- and claim-sensitive. A claim arises out of a party's transaction of business when there is a "substantial nexus" between the transaction of business and the cause of action sued upon. *See Agency Rent A Car Sys.*, 98 F.3d at 31; *Nassar*, 69 F.Supp.2d at 446.

█ The transacting business prong of section 302(a)(1) confers jurisdiction over a defendant that "purposefully avails itself of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its law." *Viacom Int'l, Inc. v. Melvin Simon Productions*, 774 F.Supp. 858, 862 (S.D.N.Y. 1991) (citations omitted). New York courts look to the totality of circumstances to determine whether the defendant has engaged in some purposeful activity in New York in connection with the matter in controversy. *See Longines–Wittnauer Watch Co. v. Barnes & Reinecke, Inc.*, 15 N.Y.2d 443, 457, 261 N.Y.S.2d 8, 18, 209 N.E.2d 68, 75 (1965). On issues of contract formation and subsequent breach, jurisdiction under 302(a)(1) may well be available "if essential negotiations between the parties occurred in New York, even if those negotiations were only preliminary." *CCS Int'l, Ltd. v. ECI Telesystems, Ltd.*, No. 97 CIV. 4646(LAP), 1998 WL 512951, at *3 (S.D.N.Y. Aug. 18, 1998).

█ Casual or sporadic acts, or even a single transaction of business in New York, are sufficient to give rise to jurisdiction under section 302(a)(1), provided that the claim itself arises out of those acts. *See CCS Int'l*, 1998 WL 512951, at *3. As the New York Court of Appeals explained in *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 527 N.Y.S.2d 195, 522 N.E.2d 40 (1988):

> It [section 302(a)(1)] is a "single act statute" and proof of one transaction in New York is sufficient to invoke jurisdiction, even though the defendant never enters New York, so long as the defendant's activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted.

71 N.Y.2d at 467, 527 N.Y.S.2d at 198–99, 522 N.E.2d at 43. However, while a single purposeful act in New York may be sufficient to confer jurisdiction, the nature and quality of a defendant's New York contacts "must be examined to determine their significance." *See Nassar*, 69 F.Supp.2d at 446.

While the New York Court of Appeals at one time appeared to suggest that a defendant's physical execution of a contract in New York might automatically constitute a jurisdiction-granting transaction for the purposes of a breach-of-contract action, *see Parke–Bernet Galleries, Inc. v. Franklyn*, 26 N.Y.2d 13, 17, 308 N.Y.S.2d 337, 340,

256 N.E.2d 506, 508 (1970), later decisions have indicated that such is not the case. *See Presidential Realty Corp. v. Michael Square West, Ltd.*, 44 N.Y.2d 672, 673–74, 405 N.Y.S.2d 37, 38, 376 N.E.2d 198, 199 (1978) (observing that "physical presence alone cannot talismanically transform any and all business dealings into business transactions under CPLR 302," and holding that signing of agreement in New York did not suffice to confer jurisdiction); *see also Abbate v. Abbate*, 82 A.D.2d 368, 384, 441 N.Y.S.2d 506, 515 (2d Dep't 1981) (noting that, while "one 'purposeful' act in this State is enough to serve as the basis for the exercise of long-arm jurisdiction over the nondomiciliary defendant," where that "act is purely ministerial, as where the parties reach full agreement on a contract in their respective home states and merely execute the formal document memorializing their agreement in New York, it is doubtful that jurisdiction would be sustained"); *Ocala Waste Disposal Assocs. v. GGC, Inc.*, No. 87 Civ. 9240(MJL), 1989 WL 46652, at *3 (S.D.N.Y. Apr. 27, 1989) ("At the outset, we agree with defendant's contention that the mere signing of the purchase contract in New York during the course of [defendant] Gould's one-day sojourn here is insufficient to subject either Enterprise or its president to this Court's jurisdiction."). Merely because pen and ink were finally put to paper in New York thus does not necessarily mean that a plaintiff may bring his or her claims in New York. *See* 2 Weinstein, Korn & Miller, New York Civil Practice ¶ 302.09 (1999) ("Although the Court of Appeals stated in dictum in *Parke–Bernet Galleries, Inc. v. Franklyn* that 'the clearest sort of case in which our courts would have 302 jurisdiction' would be a 'situation where a defendant was physically present at the time the contract was made,' that statement should not be taken to mean that making or executing the contract in New York will *ipso facto* support jurisdiction. In fact, the place of execution, though often a weighty consideration, is rarely a sufficient condition for jurisdiction on a transaction of business and is not a necessary one.").

Even when viewed in the light most favorable to Anderson, the record does not contain evidence of contacts sufficient to warrant an exercise of jurisdiction under Section 302(a)(1). While it is not seriously disputed by the defendants that the agreement at issue in the instant litigation was ultimately signed in New York, Anderson's own submissions make apparent that the agreement between the Expo and Anderson's production company was negotiated and finalized elsewhere. The details of the agreement were settled upon in Washington, D.C., and the only matter left for resolution in New York was the formal execution of a written contract. Though Anderson has submitted certain evidence from which it might be concluded that Williams expressed last-minute doubts concerning the wisdom of signing the agreement ultimately memorialized, none of his submissions to the Court indicate that the terms of the specific agreement between Anderson and the Expo were further negotiated at the meeting at King's residence. Moreover, performance by the Expo under the terms of the agreement did not call for any activities by either Williams or the Expo in New York. Indeed, the Expo's endeavors were to be limited to Indiana, where the Expo is located and the Pageant was to be held. Performance, insofar as the Expo was concerned, was to be made in Indiana.

Under such circumstances, Williams' physical presence in New York at the time of signing does not itself warrant an exercise of jurisdiction over the defendants pursuant to Section 301(a)(2). Williams' presence in New York was merely the "last act marking the formal execution of the contract," *see Longines–Wittnauer*, 15 N.Y.2d at 457 n. 5, 261 N.Y.S.2d at 18 n. 5, 209 N.E.2d at 75 n. 5, and, without more, does not suffice to subject either the Expo or Williams to jurisdiction within the forum state.

In urging this Court to nevertheless exercise jurisdiction over the Defendants, Anderson has suggested that both King and DKE, who are located in New York, and Watley, a Pennsylvania resident, functioned as the defendants' agents, and that any jurisdiction over these agents properly may be imputed to Expo and Williams as principals. Though this contention is not ultimately supportable given the evidence offered by Anderson, a brief discussion of jurisdictional agency is in order.

█ New York courts have held that a Section 302(a)(1) determination as to whether defendant has transacted business "through an agent" does not require a formal agency relationship. Rather, courts focus on the "realities of the relationship in question" to determine whether the agent acted in New York "for the benefit of, and with the knowledge and consent of the non-resident principal." *Alto Prods. Corp. v. Ratek Indus. Ltd.*, No. 95 Civ. 3314, 1996 WL 497027(LMM), at *3 (S.D.N.Y. September 3, 1996) (*quoting CutCo Indus. v. Naughton*, 806 F.2d 361, 366 (2d Cir.1986)); *D'Amato v. Lichine USA Co.*, No. 92 Civ. 8424, 1993 WL 437772 at *1 (S.D.N.Y. October 27, 1993). Courts have also required the principal to exercise some control over the agent in order to establish agency for jurisdictional purposes. *See CutCo Indus.*, 806 F.2d at 365.

At the outset, it is worth noting that Anderson has failed to identify any New York negotiations of moment concerning the *Expo's* contract with Anderson. Thus, even if one were to find that Watley or King functioned as Anderson's agents for the limited purposes of negotiating the contract presently sued upon, jurisdiction could not be properly premised upon Section 302(a)(1). For example, even assuming that Watley functioned as Williams' and/or the Expo's agent during negotiations—the only proposition with any real support in the record—this alone would not suffice to create personal jurisdiction in New York. Watley is not a New York resident, and Anderson has not identified any significant negotiations in New York concerning the specific contract presently being sued upon.

Second, though Anderson understandably lumps together his interactions with both the Expo and King, given King's independent involvement in a number of matters connected to the Expo and the simultaneous presence of both the Expo and Tyson as parties-defendant in the First Pennsylvania Action, his own submissions indicate that King had his own business dealings with Anderson. Merely because a deal between the Expo and Anderson was connected to, or dependant upon, a secondary deal between King and Anderson contemplating the performance of various activities in connection with the Expo or the Pageant, or because the Expo's agreement with Anderson was signed at King's home in New York, however, does not mean that either King or DKE functioned as the Expo's agent.

█ Finally, Anderson has not submitted any evidence indicating that either King or DKE ever took or directed any actions on either the Expo's or Williams', as opposed to his own, behalf. Merely because King took an especially active role in seeking to obtain a settlement with Anderson, or because he paid Anderson money in connection with the production of the Pageant, would not make him an agent of the Expo or Williams. Moreover, even assuming *arguendo* that Watley at various times represented both the Defendants and King in their efforts to settle the First Pennsylvania Action, this does not also mean that King automatically must be considered the Expo's or Williams' agent.

The record does not contain any evidence of King's control of the Expo's affairs, other than an unremarkable and inadmissible comment regarding King's payment of the Expo's lawyers. Neither does the record contain any evidence that King took any action for the benefit of the Expo. To the contrary, it would ap-

pear that King merely assumed an especially aggressive posture to quash a lawsuit involving Tyson, and that he engaged in various dealings with Anderson to protect his own interests. *See Ocala Waste Disposal Assocs.*, 1989 WL 46652, at *5 ("While it may be true that Erber's negotiations with Ocala's representatives inured—by way of a purchase contract—to Enterprise's benefit, to conclude therefrom that Erber's activities in this state were undertaken with Enterprise's knowledge and consent or that Enterprise exercised some degree of control over Erber's activities would require a certain leap in logic.").

 That King also had business dealings with the Expo, or that he made various and sundry alleged promises to Anderson concerning the promotion of the Pageant does not change this analysis. Even given the flexible nature of jurisdictional agency under New York law, the evidence presented by Anderson does not create a material dispute of fact concerning either King's or DKE's agency. *See Yurman v. A.R. Morris Jewelers, L.L.C.*, 41 F.Supp.2d 453, 459 (S.D.N.Y.1999) (finding that jewelry dealer was not agent for jurisdictional purposes of defendant, as plaintiff "has not established that Earl acted in New York for the benefit of, and with the knowledge and consent of Morris"); *Worldwide Futgol Assocs., Inc. v. Event Entertainment, Inc.*, 983 F.Supp. 173, 178 (E.D.N.Y.1997) (observing that defendant's control over alleged agent Schanks was unclear, and that Schanks' actions as an independent broker between parties to contract did not suffice to make *prima facie* showing that he served as defendant's agent); *Cato Show Printing Co. v. Lee*, 84 A.D.2d 947, 446 N.Y.S.2d 710 (4th Dep't 1981) (finding that independent broker/middleman was not jurisdictional agent, given that codefendant exercised no control over him); *c.f. Heinfling v. Colapinto*, 946 F.Supp. 260, 265 (S.D.N.Y.1996) (observing that "a co-conspirator may be an 'agent' as that term is used in § 302(a)(2)," but holding that plaintiff failed to show that alleged agent took acts in New York for benefit of co-conspirators, or that alleged agent acted under control of other conspirators).

### 2. Sections 302(a)(2) and 302(a)(3)

The exercise of personal jurisdiction over either the Expo or Williams would not be appropriate under Section 301(a)(2), as that provision of the long-arm statute only reaches tortious acts performed by a defendant who was physically present in New York when committing those acts. *See Bensusan Restaurant*, 126 F.3d at 28; *Kelly v. MD Buyline, Inc.*, 2 F.Supp.2d 420, 433–34 (1998).

Furthermore, jurisdiction over either the Expo or Williams pursuant to section 302(a)(3) has not been established. The exercise of jurisdiction pursuant to section 302(a)(3) requires, at a bare minimum, that the complaint adequately allege a tortious act committed by the Expo or Williams. *See Kelly*, 2 F.Supp.2d at 434. The detail provided must be such that the Court can determine whether the specific actions allegedly taken were, in fact, tortious. *See Sterling Interiors Group, Inc. v. Haworth, Inc.*, No. 94 Civ. 9216(CSH), 1996 WL 426379, at *15 (S.D.N.Y. July 30, 1996), *reconsideration denied*, 1996 WL 537482 (S.D.N.Y. Sept.23, 1996). A review of Anderson's submissions does not reveal any such detail, and Anderson has not sufficiently asserted a tortious act committed by either the Expo or Williams for jurisdiction to lie under section 302(a)(3). Indeed, in this action Anderson does not assert any tort claims, and those claims that could be generously construed as such are either repackaged breach-of-contract claims or claims not involving acts taken by the named defendants. Furthermore, any injuries allegedly suffered in New York are too attenuated to justify an exercise of jurisdiction under Section 302(a)(3).

### II. This Court Does Not Possess Personal Jurisdiction Over Either The Expo Or Williams For Purposes Of Anderson's RICO Claims

 Section 1965 of RICO provides that:

(a) Any civil action ... under this chapter ... may be instituted in the district court ... for any district in which such person resides, is found, has an agent, or transacts his affairs.

(b) In any action under § 1964 of this chapter ... in any district court ... in which it is shown that the ends of justice require that other parties residing in any other district be brought before this court, the court may cause such parties to be summoned ... and process ... may be served in any judicial district....

18 U.S.C. § 1965. As recently interpreted by the Second Circuit, Section 1965 does not confer universal personal jurisdiction over all RICO defendants. Rather, as the Court of Appeals explained in *PT United Can Co. v. Crown Cork & Seal Co.,* 138 F.3d 65 (2d Cir.1998):

Reading all of the subsections of § 1965 together, ... § 1965 does not provide for nationwide personal jurisdiction over every defendant in every civil RICO case, no matter where the defendant is found. First, § 1965(a) grants personal jurisdiction over an initial defendant in a civil RICO case to the district court for the district in which that person resides, has an agent, or transacts his or her affairs. In other words, a civil RICO action can only be brought in a district court where personal jurisdiction based on minimum contacts is established as to at least one defendant.

Second, § 1965(b) provides for nationwide service and jurisdiction over "other parties" not residing in the district, who may be additional defendants of any kind.... This jurisdiction is not automatic but requires a showing that the "ends of justice" so require. This is not an unsurprising limitation. There is no impediment to prosecution of a civil RICO action in a court foreign to some defendants if it is necessary, but the first preference, as set forth in § 1965(a), is to bring the action where suits are normally expected to be brought.

*Id.* at 71–72; *see Daly v. Castro Llanes,* 30 F.Supp.2d 407, 412–13 (S.D.N.Y.1998) ("Section 1965(a), however, does not grant jurisdiction over a defendant who was not found, did not reside, and did not transact his affairs or the affairs of the alleged RICO enterprise in New York."). To the extent that Section 1965(b) authorizes national service of process on other defendants "if the ends of justice [so] require," this phrase has been "interpreted to mean that § 1965(b) authorizes an assertion of personal jurisdiction if, otherwise, the entire RICO claim could not be tried in one civil action." *Daly,* 30 F.Supp.2d at 413; *see PT United Can Co.,* 138 F.3d at 72 n. 5.

As explained above, New York's only link to Williams and the Expo is as the locus of the formal execution of the agreement presently being sued upon. Given the specific facts of this case, this is too slender a reed upon which to rest an exercise of jurisdiction over the Defendants. Moreover, it is not disputed that both Williams and the Expo are amenable to suit in Indiana, and that Anderson's RICO claims could have been brought in that jurisdiction. Consequently, the Court finds that personal jurisdiction does not exist with respect to either Williams or the Expo.

The Court has considered Anderson's other contentions, and determined them to be without merit.

***Conclusion***

For the reasons stated herein, the Court finds that Anderson has failed to carry his burden concerning the exercise of personal jurisdiction over defendants Expo or Williams. Accordingly, this action shall be dismissed.

Submit judgment on notice.

It is so ordered.