Amelia B. PENNY, as Administratrix of the Estate of Sidney J.R. Penny, deceased, and Amelia B. Penny, individually, Plaintiff,

v.

UNITED FRUIT COMPANY, United Brands Company, Elders & Fyffes Ltd., Royal Mail Lines, Furness Withy Group, and/or Furness Withy & Co., Ltd., C.Y. Tung, Shaw Savill & Albion Co. Ltd., British Royal Navy c/o Secretary of the Admiralty, London, England, Union Castle Lines, Defendants.

Amelia B. PENNY, as Administratrix of the Estate of Sidney J.R. Penny, deceased, and Amelia B. Penny, individually, Plaintiff,

v.

CUNARD S.S. CO., LTD., a/k/a and/or Cunard Steamship Co., Ltd., Defendant.

Nos. CV–87–2732(RJD), CV–88–1435(RJD), and CV–87–1815(RJD).

United States District Court, E.D. New York.

Nov. 28, 1994.

Edward Vesel, Baron and Vesel, P.C., Kew Gardens, NY, for plaintiff.

Cary R. Wiener, Kirlin Cambell & Keating, New York City, John F. Ingram, Burlingham Underwood & Lord, New York City, for defendants.

## MEMORANDUM AND ORDER

DEARIE, District Judge.

These two asbestos actions raise complex issues involving the interplay of admiralty and maritime law and long-arm jurisdiction. Plaintiff, the administratrix and widow, alleges that her late husband, Sidney J.R. Penny, was exposed to asbestos while working aboard ships owned by the defendants. Claiming that the exposure caused Mr. Penny's mesothelioma and subsequently his death, plaintiff seeks damages under the Jones Act, 46 U.S.C.App. § 688 *et seq.*, the general maritime law, and the New York Estates, Power and Trusts Law.

Defendants Cunard Steam–Ship Company, ("Cunard Steam"), Elders & Fyffes, Ltd. ("Elders"), Royal Mail Lines ("Royal Mail"), and Shaw Savill & Albion Co. Ltd. ("Shaw Savill") have moved to dismiss for lack of personal and subject matter jurisdiction or, alternatively, on forum non conveniens grounds. Defendants United Fruit Company ("United Fruit"), United Brands Company ("United Brands"), Furness Withy Group, and Furness Withy & Co., Ltd. ("Furness Withy") have moved for summary judgment on the grounds that they (i) did not own the ships on which the decedent worked and (ii) did not employ the decedent.[1] For the reasons stated below, defendants' motions are granted.

## BACKGROUND

From 1958 to 1962, Sidney J.R. Penny, then a citizen of the United Kingdom, was employed as a chef or caterer on various oceangoing vessels owned by defendants.[2]

1. The Court has granted defendant Cunard Line, Ltd.'s and the British Royal Navy's motions for summary judgment. Defendants C.Y. Tung and Union Castle Lines were never served. Accordingly, these parties are not before the Court.

2. Mr. Penny's work history during this period is charted below:

| Ship and Owner | Date voyage Began | Date voyage Ended |
| --- | --- | --- |
| Carnarvon Castle (Union Castle) | April 9, 1958 | May 23, 1958 |
| Southern Cross (Shaw Savill) | May 27, 1958 | August 13, 1958 |
| Andes (Royal Mail) | September 5, 1958 | November 28, 1958 |
| Andes (Royal Mail) | December 15, 1958 | April 15, 1959 |
| Andes (Royal Mail) | April 23, 1959 | May 22, 1959 |
| F.A. Airsprite (Royal Navy) | June 29, 1959 | July 22, 1959 |
| Stirling Castle (Union Castle) | July 29, 1959 | September 1, 1959 |
| Saxonia (Cunard Steam) | September 15, 1959 | December 5, 1959 |
| Saxonia (Cunard Steam) | January 4, 1960 | January 30, 1960 |
| Carnarvon Castle (Union Castle) | February 11, 1960 | March 25, 1960 |
| Queen Mary (Cunard Steam) | March 29, 1960 | June 7, 1960 |
| Queen Mary (Cunard Steam) | June 21, 1960 | August 10, 1960 (approximately) |
| Queen Mary (Cunard Steam) | August 24, 1960 | September 6, 1960 |
| Ivernia (Cunard Steam) | November 16, 1960 | December 5, 1960 |
| Ivernia (Cunard Steam) | January 1, 1961 | February 25, 1960 |
| Queen Elizabeth (Cunard Steam) | March 7, 1961 | May 16, 1961 |
| Queen Elizabeth (Cunard Steam) | May 30, 1961 | August 15, 1961 |
| Queen Elizabeth (Cunard Steam) | August 29, 1961 | October 10, 1961 |
| S.S. Golfito (Elders) | November 28, 1961 | December 24, 1961 |
| Queen Mary (Cunard Steam) | January 18, 1962 | May 8, 1962 |
| Queen Mary (Cunard Steam) | May 22, 1962 | July 3, 1962 |

With few exceptions, none of these vessels ever entered New York waters during Mr. Penny's years of service and many never even called on United States ports. Only Cunard Steam's QUEEN MARY and QUEEN ELIZABETH sailed to New York during the period of Mr. Penny's

In 1962, Mr. Penny retired from service and emigrated to the United States. Twelve years later, Mr. Penny was naturalized as a United States citizen. Some time thereafter, he developed mesothelioma and in 1986, at the age of 44, he succumbed to the disease.

## IN PERSONAM JURISDICTION

The Court will address the jurisdictional issues first. Defendants Cunard Steam, Elders, Royal Mail, and Shaw Savill [3] argue that they fall outside the reach of New York's jurisdictional statutes, New York Civil Practice Law & Rules ("CPLR") 301 and 302, and, if not, that the exercise of jurisdiction over them would be violative of due process under the constitutional standards laid down in *International Shoe v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), and its progeny. Since the Court finds that there is no long-arm jurisdiction over any of these defendants, there is no need to reach the constitutional issue.

█ Plaintiff has the burden of making a *prima facie* showing of jurisdiction. In cases brought under the Jones Act, personal jurisdiction is proper only if the defendant has both national contacts and is subject to the jurisdiction of the state in which the district court sits. *Loberiza v. Calluna Maritime Corp.*, 781 F.Supp. 1028, 1030 (S.D.N.Y.1992) (citing *Gazis v. John S. Latsis Inc.*, 729 F.Supp. 979, 991 (S.D.N.Y.1990)). Accordingly, jurisdiction in these cases must be determined with reference to the only possible bases of jurisdiction under New York law, CPLR 301 and 302. *Loberiza*, 781 F.Supp. at 1030.

### CPLR 301: Doing Business

█ CPLR 301, which tersely states that a New York court "may exercise such jurisdiction over persons, property, or status as might have been exercised heretofore," incorporates into statute all bases of jurisdiction previously recognized at common law. CPLR 301 provides, among other things, for personal jurisdiction over a foreign corporation present or "doing business" in New York. A corporation's activity rises to the level of doing business when it is engaged in "such a continuous and systematic course of activity that it can be deemed to be present in the state of New York." *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 50–51 (2d Cir.1991) (quoting *Laufer v. Ostrow*, 55 N.Y.2d 305, 449 N.Y.S.2d 456, 458, 434 N.E.2d 692, 694 (1982)) (other citations omitted). Under CPLR 301, whether a corporation is present in New York is determined based on the time the lawsuit was filed, not when the claim arose. *Aaacon Auto Transport, Inc. v. Barnes*, 603 F.Supp. 1347, 1351 (S.D.N.Y.1985) (citations omitted); *Darby v. Compagnie Nat'l Air France*, 735 F.Supp. 555, 560 (S.D.N.Y.1990). *See also* Weinstein, Korn, Miller, *New York Civil Practice*, Section 301.16 (1986). It is quite clear that, at the time the suits were brought, none of the defendants was 'doing business' in New York, as that term has been consistently

employment. All vessels flew the British flag and all voyages began and ended in England. It also appears from the voluminous materials provided to the Court that Mr. Penny may have worked exclusively for Cunard Steam in his last two years at sea, excepting one twenty-six day period in November and December of 1962, when he sailed on board the S.S. GOLFITO, the only ship identified in the complaint as having been owned at the time by the defendant Elders. Defendant Shaw Savill employed Mr. Penny on one occasion between May 27 and August 13, 1958 as a crew member aboard the SOUTHERN CROSS. As for defendant Royal Mail, Mr. Penny was employed on only one of its vessels, the ANDES, on three separate voyages in 1958 and 1959.

In her moving papers, plaintiff appears to dispute some facts about where Mr. Penny's ships sailed, arguing that some ships did in fact sail into United States waters. A number of these factual disputes might ordinarily require some resolution before final action by the Court. In light of the Court's rulings on the issues of jurisdiction and forum non conveniens, any lingering factual disputes are irrelevant to the adjudication of these cases.

3. As previously noted, only ships owned by defendant Cunard Steam sailed to New York during the period of Mr. Penny's employment. In this respect, Cunard Steam has more connection with New York State than the other named defendants. Nevertheless, since the Court dismisses this action even with respect to Cunard Steam, the Court does not distinguish between the individually named defendants in the jurisdictional analysis that follows.

interpreted.[4] (*See* Aff. of Brian Norman Barlow (Cunard); Aff. of Allan Ditchfield (Elders); Aff. of Herbert Suffield (Royal Mail); Aff. of Maurice William Hulbert (Shaw Savill).) Accordingly, since none of the defendants was doing business in New York at the time these actions were commenced, CPLR 301 does not provide a basis for jurisdiction over the defendants.

### CPLR 302: Long–Arm Jurisdiction

Plaintiff attempts to support long-arm jurisdiction over defendants by the quirky and uncertain path of CPLR 302. CPLR 302 allows, under certain conditions, jurisdiction over non-residents for tortious acts occurring outside New York. The section was "not intended to reach the limits of long arm jurisdiction allowed under the federal constitution." *In re DES Cases,* 789 F.Supp. 552, 569 (E.D.N.Y.1992), (citing *Banco Ambrosiano v. Artoc Bank & Trust, Ltd.,* 62 N.Y.2d 65, 476 N.Y.S.2d 64, 464 N.E.2d 432 (1984)), *appeal dismissed,* 7 F.3d 20 (2d Cir.1993). *See also* Siegel, *New York Practice,* 122 (1991) ("CPLR 302 does not go as far as due process permits.")

CPLR 302 states in pertinent part:

(a) **Acts which are the basis of jurisdiction.** As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary ... who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

2. commits a tortious act within the state ...; or

3. commits a tortious act without the state causing injury to person or property within the state ... if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

Plaintiff's principal contention is that jurisdiction may be asserted under CPLR 302(a)(3).

### CPLR 302(a)(3)

■ Plaintiff contends, in substance, that by exposing Mr. Penny to asbestos, defendants committed "a tortious act without the state causing injury to person ... within the state," the injury being Mr. Penny's mesothelioma, only apparent after he had taken up residence in New York. Defendants assert that Mr. Penny's injury took place at the point of exposure, not in New York, thereby precluding reliance on CPLR 302(a)(3) as a basis for jurisdiction. The Court resolves this threshold issue in favor of plaintiff.

Defendants argue that any injury to Mr. Penny occurred outside New York at some unknown place and time during his years of service at sea. They embrace certain cases that do distinguish between the injury and resulting damages and other marginally valuable precedents involving business torts that stand for the unremarkable proposition that the situs of the injury is not controlled merely by the plaintiff's domicile. *See, e.g., Trafalgar Capital Corp. v. Oil Producers Equipment,* 555 F.Supp. 305 (S.D.N.Y.1983); *Spectacular Productions, Inc. v. Radio Station WING,* 272 F.Supp. 734 (E.D.N.Y.1967). Two New York Court of Appeals cases relied upon by defendants, *Steinhardt* and its forbear *Schmidt,* are of little assistance since

---

4. Plaintiff makes some attempt to demonstrate the contrary by directing the Court's attention to the activities of parties affiliated with the defendants but who are not parties to this suit. In particular, plaintiff notes that Cunard Line, Ltd. continues to have significant contacts with New York. Plaintiff's reliance on unsupported, conclusory allegations is unpersuasive. Plaintiff has not presented any evidence that contradicts Cunard Steam's detailed assertion that it has not been doing business in New York since well before this action was commenced. Nor has plaintiff offered any evidence to suggest that Cunard Line, Ltd. and Cunard Steam are in reality a single entity; the mere listing in Lloyd's Maritime Directory of an address for Cunard Steam at the same location where Cunard Line Ltd. maintains an office cannot raise such an inference.

both address the issue of when a cause of action accrues for statute of limitations purposes. *See Steinhardt v. Johns–Manville Corp.,* 54 N.Y.2d 1008, 446 N.Y.S.2d 244, 430 N.E.2d 1297 (1981), *cert. denied, Rosenberg v. Johns Manville Corp.,* 456 U.S. 967, 102 S.Ct. 2226, 72 L.Ed.2d 840 (1982); *Schmidt v. Merchants Despatch Transportation Co.,* 270 N.Y. 287, 200 N.E. 824 (1936). Those and similar authorities—since "overruled" by the New York Legislature—add little, if anything, to the discussion of whether Mr. Penny suffered injury in New York.

More relevant authorities address the issue directly. The Appellate Division in *Askey v. Occidental Chemical Corp.* held that plaintiffs who had been exposed to toxic substances had a claim for injuries not yet present, but restricted the rule to cases where the "probability of their occurrence [amounted to] a reasonable certainty." 102 A.D.2d 130, 477 N.Y.S.2d 242, 247 (4th Dep't 1984). As Judge Freedman recognized in a later case,

> to meet this reasonably certain standard, courts have generally required plaintiffs to prove that it is more likely than not (a greater than 50% chance) that the expected consequences will occur.

*Fusaro v. Porter–Hayden Co.,* 145 Misc.2d 911, 548 N.Y.S.2d 856, 859 (Sup.Ct. N.Y. County 1989) (quoting *Wilson v. Johns–Manville Sales Corp.,* 684 F.2d 111, 119 (D.C.Cir.1982)). In *Fusaro,* as here, the decedent suffered from mesothelioma; in discussing the applicability of *Askey,* Judge Freedman noted that

> [s]ince the likelihood that any asbestosis victim including [the plaintiff] would contract mesothelioma is substantially below 50%, he would not have been eligible to recover for the increased risk of developing mesothelioma.

*Fusaro,* 548 N.Y.S.2d at 589.

As far as can be determined from the record, the same reasoning readily applies here; since Mr. Penny suffered from mesothelioma, a rare form of cancer, he would have been barred under New York law from pressing a claim at the point of exposure, precisely because his claim would have been "contingent, speculative, or merely possible."

*Askey,* 477 N.Y.S.2d at 247. It would be difficult indeed to conclude that Mr. Penny's injury was complete at the point of exposure, at a time when he would have had no cognizable cause of action. *Askey* and other cases involving risk of injury highlight the pitfalls of rigidly equating exposure with injury, and reinforce the notion that the two are factually and legally distinct. A similar conclusion was reached by Judge Weinstein in *DES,* who noted that where "an allegedly harmful drug is ingested in New York, or acts upon a resident of the state while the resident is in the state, ... the situs of the injury [under CPLR 302(a)(3)(ii)] is New York." *In re DES Cases,* 789 F.Supp. 552, 570 (E.D.N.Y. 1992).

Defendants rely on *Kramer v. Hotel Los Monteros,* 57 A.D.2d 756, 394 N.Y.S.2d 415 (1st Dept.1977), in which the plaintiff, having been bitten by a dog while in Spain, developed septicemia upon returning to New York. In that case, the court noted that CPLR 302(a)(3) "looks to the imparting of the original injury within the State of New York and not resultant damage, in order that jurisdiction might be effectuated." *Kramer,* 394 N.Y.S.2d at 416 (quoting *Black v. Oberle Rentals, Inc.,* 55 Misc.2d 398, 285 N.Y.S.2d 226, 229 (1967)). Of course, in these cases, there is no ascertainable site of "original injury" outside the state on which the plaintiff might have based an action; to characterize the manifestation of mesothelioma as merely "resultant damage"—or, as it is sometimes put, "derivative"—would merely be another attempt to claim that Mr. Penny's injury was somehow complete at the point of exposure, a conclusion that this Court rejects. Further, it is apparent that the *Kramer* Court was concerned with the potentially unlimited reach of CPLR 302 if the statute was interpreted to cover the facts in that case:

> [t]o hold otherwise would open a veritable Pandora's box of litigation subjecting every conceivable prospective defendant involved in an accident with a New York domiciliary to defend actions brought against them in the State of New York.

394 N.Y.S.2d at 416 (quoting *Black,* 285 N.Y.S.2d at 229). Judge Weinstein in *DES*

addressed this concern squarely when he made the telling observation, equally appropriate for Mr. Penny, that "there is no sense in which plaintiffs have merely carried their injuries into the state for the purpose of bringing suit." *In re DES*, 789 F.Supp. at 570. Since Mr. Penny became a citizen many years before his illness first appeared, his presence in New York could hardly be deemed transitory or motivated by a desire to better his chances in litigation. Like the *DES* plaintiffs, and unlike the plaintiff in *Kramer*, Mr. Penny's claims are not based on consequential damages but on his original injury; thus, the potential abuse which the *Kramer* Court identified is not presented here.

On this record, the Court concludes that the alleged conduct caused injury in New York, thereby satisfying the initial requirement of CPLR 302(a)(3) that the defendant committed a tortious act outside New York causing injury within New York.

*CPLR 302(a)(3)(ii)*

■ For the reasons stated, the Court concludes that the first component of CPLR 302(a)(3) has been satisfied; it remains to be seen whether the additional exacting requirements of that section have been met as well. Plaintiff relies primarily on subpart (ii) of CPLR 302(a)(3), which requires that a defendant

expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

N.Y. Civ. Prac. Law & R. § 302(a)(3)(ii) (McKinney 1990). Although most of the defendants who challenge the Court's jurisdiction assert that they have no significant contacts with New York, none has claimed that it does not derive substantial revenue from international commerce; nor, given the nature of their business, does it appear that, with the exception of Elders, they could make such a claim. Thus, the issue is whether the defendants "expect[ ] or should reasonably expect" their actions to have consequences in New York.

In *Tracy v. Paragon Contact Lens Laboratories*, 44 A.D.2d 455, 355 N.Y.S.2d 650, 653 (3d Dep't 1974), the Appellate Division re-

jected the contention that acts of the plaintiff or of unaffiliated third parties were sufficient to establish jurisdiction: "it is the *defendant's* expectation of forum consequences that controls." *Tracy*, 355 N.Y.S.2d at 653 (emphasis in original) (citation omitted). In language which foreshadowed the United States Supreme Court's decision in *World–Wide Volkswagen v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980), the court observed:

Nor is it determinative, as the trial court believed, that contact lenses are of a personal nature and it therefore can be foreseen that they will be taken with the owner to home, work or place of travel. If such an approach were correct, then the foreseeable consequences test would lose all substance, for who can say that it is never foreseeable, in this modern age of fast and frequent transportation, that a defect in a readily moveable item of a personal nature could have consequences in New York or anywhere else in the world? ... In our view, such a New York consequence would have to be regarded as fortuitous.

*Tracy*, 355 N.Y.S.2d at 653.

■ Cases addressing CPLR 302(a)(3)(ii)'s foreseeability requirement after *World–Wide Volkswagen* have done so "with an eye on" that case, *Montalbano v. Easco Hand Tools*, 766 F.2d 737, 741 (2d Cir.1985) (quoting J. McLaughlin, *Practice Commentaries*, N.Y. Civ. Prac. Law & R. § 302 at 37 (McKinney Supp.1984)), frequently combining the "reasonable anticipation of suit" analysis of *World–Wide Volkswagen* with the foreseeability requirements of CPLR 302. *See, e.g., Martinez v. American Standard*, 91 A.D.2d 652, 457 N.Y.S.2d 97, 99 (2d Dep't 1982), *aff'd*, 60 N.Y.2d 873, 470 N.Y.S.2d 367, 458 N.E.2d 826 (1983); *Darienzo v. Wise Shoe Stores, Inc.*, 74 A.D.2d 342, 427 N.Y.S.2d 831, 833–34 (2d Dep't 1980). *See also Schaadt v. T.W. Kutter, Inc.*, 169 A.D.2d 969, 564 N.Y.S.2d 865, 866 (3d Dep't 1991); *Murdock v. Arenson Int'l USA, Inc.*, 157 A.D.2d 110, 554 N.Y.S.2d 887, 889 (1st Dep't 1990). CPLR 302 only requires that some forum consequences be foreseeable, not the specific injuries suffered by a particular plaintiff. *Fantis Foods, Inc. v. Standard*

*Importing Co.,* 49 N.Y.2d 317, 425 N.Y.S.2d 783, 787, 402 N.E.2d 122, 126 (1980); *Tracy,* 355 N.Y.S.2d at 652. Since CPLR 302 was intended to reach product liability injuries, it follows that, as a general matter, defendants need not have been able to foresee the identity of the plaintiff. Nevertheless, although the allegedly tortious act need not itself be directed at New York, there must be a reasonable basis to expect that the act itself will have consequences there.

The facts of these cases are somewhat different from many of the cases mentioned above, in that the defendants did not manufacture products for distribution in interstate or international commerce; rather, they provided transportation services on ocean-going vessels, operations which by their nature only touch a given jurisdiction at the periphery.[5] In order to support long-arm jurisdiction under CPLR 302(a)(3)(ii), plaintiff must show that the defendants expected or should reasonably have expected the tortious act— exposing crewmembers to asbestos fibers on their ships—to have consequences in New York. Put another way, should the British shipowners have foreseen that one of their British crewmembers would move to New York, become an American citizen, and then develop mesothelioma as a New Yorker? Simply posing the question provides the answer. As in *Tracy,* "such a New York consequence would have to be regarded as fortuitous." *Tracy,* 355 N.Y.S.2d at 653. *See also Colon v. Gulf Trading Co.,* 609 F.Supp. 1469, 1480 (D.C.P.R.1985) ("It verges on the absurd to argue that a shipowner should reasonably foresee that an unseaworthy condition such as exposed asbestos fibers would manifest its harmful effects years later in

Puerto Rico merely because a crewmember it hired was born in Puerto Rico or had family ties here, although the crewmember resided elsewhere.") Accordingly, since the foreseeability requirement of CPLR 302(a)(3)(ii) is unsatisfied, there is no jurisdiction to hear these cases under New York's long-arm statute.[6]

### Additional Jurisdictional Issues

Plaintiff raises a number of additional jurisdictional points, most of which need not be addressed in light of the Court's holding that it is without jurisdiction over *any* of the moving defendants. Plaintiff's alternative argument, that Shaw Savill, Royal Mail, and Elders be considered "mere departments" of their parent corporations, over whom their might be jurisdiction, is also rejected. For the reasons discussed in the Court's analysis of the motions for summary judgment brought by defendants Furness Withy Group, Furness Withy, United Fruit, and United Brands, the Court concludes that there is no basis in fact to disregard the corporate form for jurisdictional purposes. Stated simply, the Court has no jurisdiction over defendants Cunard Steam, Elders, Royal Mail, and Shaw Savill.

### FORUM NON CONVENIENS

Cunard Steam, Elders, Royal Mail, and Shaw Savill have moved to dismiss on the grounds of forum non conveniens.[7] Having found no basis for jurisdiction over these defendants, the Court need not examine this issue. However, the Court notes that the forum non conveniens doctrine provides an alternate—indeed, virtually overwhelming—basis for dismissal.

---

**5.** In Cunard Steam's case, the consumers of such services appear to have been members of the public. Elders appears to have used its ships to transport produce purchased in the Caribbean and South America to other countries. The Court is unaware of the nature of Shaw Savill's and Royal Mail's business.

**6.** Plaintiff's attempt to rely on CPLR 302(a)(3)(i) as an alternate basis for jurisdiction is rejected. The relevant time period for this inquiry is the time of suit. At the time of filing, it is patently clear that defendants were not regularly doing or soliciting business in New York.

**7.** These defendants also style their motions as motions to dismiss for lack of subject matter jurisdiction; however, in their moving papers, they only discuss choice of law and forum non conveniens. As the Supreme Court noted in *Lauritzen v. Larsen,* "[a]s frequently happens, a contention that there is some barrier to granting plaintiff's claims is cast in terms of an exception to jurisdiction of subject matter. A cause of action under our law was asserted here, and the court had power to determine whether it was or was not well founded in law and in fact." 345 U.S. 571, 575, 73 S.Ct. 921, 924, 97 L.Ed. 1254 (1953) (citation omitted).

Forum non conveniens is a prudential doctrine that permits a court to dismiss a case even where jurisdiction is technically proper. Justice Jackson's seminal opinion in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947), set forth the factors to be considered by a trial court in exercising its discretion whether to dismiss a case on the ground of forum non conveniens. A prerequisite for invoking this doctrine is that an alternative forum is readily available. *Piper Aircraft v. Reyno*, 454 U.S. 235, 254, n. 22, 102 S.Ct. 252, 265, n. 22, 70 L.Ed.2d 419 (1981) ("At the outset of any forum non conveniens inquiry, the court must determine whether there exists an alternative forum.") In these cases, defendants have demonstrated that this condition is satisfied: plaintiff can sue defendants in England if the actions are dismissed here. Indeed, defendants have consistently indicated a willingness "to stipulate to the usual conditions attendant to a forum non conveniens dismissal." [8] (Cunard Steam's Reply Mem. at 10.)

Under *Gilbert*, the Court must weigh both the "private interest factors" affecting the convenience of the litigants, as well as the "public interest factors" affecting the convenience of the forum. *See Gilbert*, 330 U.S. at 508, 67 S.Ct. at 843. Those factors relevant to the litigant's private interest include the following: the relative ease of access to sources of proof; the availability of compulsory process, the location of probable witnesses, and the cost of securing their attendance; the possibility of viewing the subject premises; and "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gilbert*, 330 U.S. at 506–10, 67 S.Ct. at 842–43. The factors bearing on the public interest include compelling jurors to serve on cases in which the community has little or no interest; the preference for having localized controversies decided at home; docket congestion in the court in which the action was filed; and the interest in having the action tried in the forum whose law will be applied. *Gilbert*, 330 U.S. at 506–10, 67 S.Ct. at 842–43.

The private interests in these cases point decidedly toward dismissal. Indeed, each of the private *Gilbert* factors indicate that England is the more convenient forum. Virtually every significant source of proof in these cases will be found in England. Plaintiff scarcely argues otherwise. Plaintiff's somewhat disingenuous identification of New York witnesses that she would seek to call at trial is hardly enough to swing this factor in her favor. (*See* Plaintiff's Mem. in Opp. to Cunard Steam's Motion at Exhibits D–F (containing affidavits of three seamen who worked on ships on which Mr. Penny sailed, although admittedly not at the same time)). The very nature of these actions—involving the condition on British ships at the time Mr. Penny was a British citizen—belies the notion that somehow most of the witnesses would be New Yorkers. Indeed, any common sense assessment of this and the other enumerated private interest factors reveals England to be by far the more appropriate, the more convenient, forum for these cases.

Plaintiff's best argument, and really the only factor favoring litigating these cases in New York, is the notion that as an American citizen, her choice of forum should be honored. While it is true that plaintiff's choice of forum is ordinarily respected, the Second Circuit has soundly rejected the notion that the American citizenship of a plaintiff creates a special rule of forum non conveniens. *Alcoa S.S. Co., Inc. v. M/V Nordic Regent*, 654 F.2d 147, 153 (2d Cir.1980) (en banc) (dismissing admiralty action brought by American plaintiff on ground of forum non conveniens). *See also Sussman v. Bank of Israel*, 801 F.Supp. 1068, 1073 (S.D.N.Y.1992) (citing cases), *aff'd*, 990 F.2d 71 (1993)). Indeed, the *Alcoa* court noted that the "trend of both the common law generally and admiralty law in particular has been away from according a talismanic significance to the citizenship or residence of the parties." *Alcoa*, 654 F.2d at

---

**8.** The ordinary conditions accompanying a forum non conveniens dismissal include requiring defendants to submit to service of process and jurisdiction in the foreign court and requiring them to waive any limitations defenses that would not have been available when the complaint was filed in the United States. *See, e.g., Sussman v. Bank of Israel*, 990 F.2d 71, 71 (2d Cir.1993).

154. Moreover, although Mrs. Penny and her family are American, the interests of the United States in these actions are somewhat diminished by the fact that at the time Mr. Penny was exposed to asbestos he was a British seaman sailing to and from England, ordinarily never even approaching New York shores.

The public interest factors also favor dismissal of these cases. The three principles underlying the public interest factors have been summarized as follows:

> First, that courts may validly protect their dockets from cases which arise within their jurisdiction, but which lack significant connection to it; second, that courts may legitimately encourage trial of controversies in the localities in which they arise; and third, that a court may validly consider its familiarity with governing law when deciding whether to retain jurisdiction over a case.

*Pain v. United Technologies Corp.*, 637 F.2d 775, 791–92 (D.C.Cir.1980), *cert. denied*, 454 U.S. 1128, 102 S.Ct. 980, 71 L.Ed.2d 116 (1981) (other citations omitted). For the reasons stated above, the first two factors clearly favor adjudication of this controversy by an English court. Quite simply, other than the fortuity that Mr. Penny moved to New York after his service on British ships, the United States in general and New York in particular have *no* connection to the instant cases.[9]

In sum, both the private and the public interest factors listed in *Gilbert* lend themselves toward dismissal in these cases. Under *Piper*, "the central purpose of any forum non conveniens inquiry is to ensure the trial is convenient...." *Piper*, 454 U.S. at 261, 102 S.Ct. at 261. *See also R. Maganlal & Co. v. M.G. Chem. Co.*, 942 F.2d 164, 167 (2d Cir.1991) ("The central purpose of a forum non conveniens inquiry is to determine where trial will be most convenient and will serve the ends of justice.") (citations omitted). An analysis of the relevant factors convincingly demonstrates that trying these actions in New York would be inconvenient, inappropriate, and would not serve the ends of justice. The British courts are open and available to plaintiff. Accordingly, even if the Court had jurisdiction, dismissal on the discretionary grounds of forum non conveniens would be highly appropriate.

## MOTIONS FOR SUMMARY JUDGMENT

The Furness Withy Group, Furness Withy, United Fruit, and United Brands have moved for summary judgment on the grounds that they never employed Mr. Penny and that they never owned or operated the ships on which he was employed.[10]

 The Jones Act provides a right of action only against a seaman's "employer." *Cosmopolitan Co. v. McAllister*, 337 U.S. 783, 789, 69 S.Ct. 1317, 1321, 93 L.Ed. 1692 (1949); *Mahramas v. American Export Isbrandtsen Lines, Inc.*, 475 F.2d 165, 170 (2d Cir.1973); *Karvelis v. Constellation Lines*

---

**9.** With respect to choice of law, the Second Circuit has stated that "maritime choice of law principles are not involved in a forum non conveniens analysis...." *Cruz v. Maritime Co.*, 702 F.2d 47, 48 (2d Cir.1983). Nevertheless, the Court notes that British law would undoubtedly apply to these cases. In *Lauritzen*, 345 U.S. at 581–93, 73 S.Ct. at 928–34, the Supreme Court identified seven factors which have traditionally played a role in maritime choice-of-law analysis: (i) the place of the wrongful act, (ii) the law of the flag, (iii) the allegiance or domicile of the injured person, (iv) the allegiance of the defendant shipowner, (v) the place of the contract, (vi) the inaccessibility of a foreign forum, and (vii) the law of the forum. Of these factors, the law of the flag is of "cardinal importance," and "overbears most other connecting events in determining applicable law;" indeed, in *Lauritzen* this factor was of "such weight ... that it must prevail unless some heavy counterweight ap-

pears." *Lauritzen*, 345 U.S. at 583–87, 73 S.Ct. at 929–30. Without meaning to disparage plaintiff's claims and fully cognizant of the tragedy underlying these cases, the Court is of the view that the fact that Mr. Penny emigrated to the United States is simply fortuitous, and the fortuity of the place of injury flows from that fact as well. Chocie of law should not turn on serendipity. It is quite clear, therefore, that under traditional choice of law principles, British law would apply to these actions.

**10.** In addition, Furness Withy Group moves for summary judgment on the ground that it is not a suable entity. This argument has significant force. Nevertheless, it is not necessary to decide this issue, because, even if Furness Withy Group is properly subject to suit, summary judgment would be appropriate on the grounds described below.

*S.A.*, 806 F.2d 49, 52 (2d Cir.1986). Relying on *Cosmopolitan* for the proposition that "under the Jones Act *only one person, firm, or corporation* can be sued as employer." *Cosmopolitan*, 337 U.S. at 789, 69 S.Ct. at 1321 (emphasis added), United Fruit and United Brands argue that since Elders admits it employed Mr. Penny, they cannot be sued under the Jones Act. However, *Cosmopolitan* was directed at the issue of whether, in cases where the employer was not the same person as the operator of the ship, a Jones Act claim would lie against the operator; the case had nothing to do with parent-subsidiary relationships.

The Second Circuit has recognized that in cases where a subsidiary is a "mere instrumentality" of the parent, the parent may properly be sued under the Jones Act. *Williams v. McAllister Bros., Inc.*, 534 F.2d 19, 21 (2d Cir.1976). Under *Williams*, the test is essentially equivalent to whether or not to pierce the corporate veil:

> Ownership by a parent of all its subsidiary's stock has been held an insufficient reason in and of itself to disregard distinct corporate entities. Actual domination, rather than the opportunity to exercise control, must be shown.

534 F.2d at 20 (citations omitted). According to *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft, Corp.*, 751 F.2d 117, 120–122 (2d Cir.1984), whether a parent so dominates a subsidiary as to warrant disregarding the corporate separateness of the two entities depends on four factors: (i) whether the corporations are commonly owned, or nearly so; (ii) the degree of financial dependency of the subsidiary on the parent; (iii) the degree to which the parent corporation interferes with the selection and assignment of the subsidiary's executive personnel and fails to observe corporate formalities; and (iv) the degree of control over the marketing and operational policies of the subsidiary exercised by the parent.

Despite significant efforts, plaintiff has not raised a genuine issue of fact to demonstrate that Shaw Savill and Royal Mail were "mere departments" of Furness Withy, or that Elders was a "mere department" of United Brands or United Fruits. In this regard, an analysis of plaintiff's arguments with respect to Shaw Savill and Royal Mail is instructive. Shaw Savill and Royal Mail are wholly-owned subsidiaries of Furness Withy. Accordingly, the first factor, which New York courts describe as "essential," has been met. *See Delagi v. Volkswagenwerk AG*, 29 N.Y.2d 426, 328 N.Y.S.2d 653, 657, 278 N.E.2d 895, 897 (1972). Regarding the other three factors, plaintiff points vaguely to the presence of overlapping directors and officers during the years 1958–1962 and 1982–1988. The Court notes that in the earlier period, of Furness Withy's twenty-two directors, eight served on the boards of either Shaw Savill or Royal Mail or both; in neither case did the common directors form a majority of the board of either subsidiary.[11] In the later period, a similar situation obtained, with seven of Furness Withy's directors serving on subsidiary boards, but in no case forming a majority.[12] It is true that information provided by these defendants indicates that from December 1987 on, Maurice Hulbert was the sole officer of Furness Withy, Shaw Savill, and Royal Mail; this by itself, however, is hardly sufficient. As the Second Circuit noted in *Beech Aircraft*:

> Of course, the officers of a parent normally control the board of directors of a subsidiary in their capacity as representatives of the controlling stockholder. However, when the parent officers extend their control beyond that normally exercised by boards of directors, their behavior supports an inference that the subsidiary is not an independent entity.

751 F.2d at 121. Plaintiff has provided no information to suggest that the degree of control exercised by Mr. Hulbert is in any way unusual or overbearing. Nor has it offered any evidence to indicate that Shaw Savill and Royal Mail are financially dependent on their parent corporations, that the

---

11. Of Shaw Savill's fifteen directors, six also served on Furness Withy & Co. Ltd.'s board; of Royal Mail's fifteen directors, four were on the parent's board.

12. For this period, eight directors were listed for Shaw Savill, of whom three were on Furness Withy's board; of Royal Mail's nine directors, four were on Furness Withy's board.

parents do not observe corporate formalities, or that they dominate the marketing and operational policies of their subsidiaries. New York law requires more of a showing than plaintiff's conclusory claim that Shaw Savill and Royal Mail are "mere departments" of their parent corporations. Plaintiff's arguments concerning United Fruit's[13] ownership of Elders are similarly rejected.

For the reasons stated, the Court concludes that plaintiff has failed to raise a genuine issue of material fact with respect to these issues. The evidence presented merely shows an unremarkable amount of overlap of officers and directors, and does not give rise to any inference of improper handling or commingling of corporate affairs. Accordingly, the motions for summary judgment brought by defendants Furness Withy Group, Furness Withy, United Fruit, and United Brands are granted.

## CONCLUSION

The motions of defendants Cunard Steam, Elders, Royal Mail, and Shaw Savill to dismiss these actions for lack of personal jurisdiction are granted. Alternatively, these actions are dismissed on the grounds of forum non conveniens, subject to the conditions noted earlier. In addition, the motions for summary judgment brought by United Fruit, United Brands, Furness Withy Group, and Furness Withy are granted. The complaints are dismissed.

SO ORDERED.

---

**13.** United Fruit Company changed its name in 1970 to United Brands Company. Counsel for United Brands has informed the Court that "Chiquita Brands is now the operating entity of United Brands Company." *See* Letter of John G. Ingram to Edward Vesel dated September 8, 1988. The operations and liabilities of Elders were assumed by Fyffes Group Limited in 1970. *Id.*